IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 6, 2012

## TAURUS MERRIWEATHER V. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 05-06981    Chris Craft, Judge**

_____

**No. W2011-01271-CCA-R3-PC  - Filed July 17, 2012**

_____

The Petitioner, Taurus Merriweather, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his conviction for second degree murder and effective twenty-five-year sentence.  On appeal, he contends that the trial court erred by finding that counsel provided the effective assistance of counsel.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Robert Amann, Memphis, Tennessee, for the appellant, Taurus Merriweather.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Amy P. Weirich, District Attorney General; and Stephanie Johnson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This court summarized the facts of the case in the Petitioner's appeal of his conviction:

> Vivian Crawford, the victim's older sister, testified that she witnessed a fight between Merriweather and the victim outside of a store about a month prior to the victim's death. She observed Merriweather retrieve a stick that was "made like a bat" from the trunk of his car, approach the victim, and swing at him.  Crawford explained that she yelled to the victim to "look

out" and the victim ducked. Merriweather and the victim then began fighting until someone stopped the fight. . . . Crawford stated that she did not know why they were fighting.

On cross-examination, Crawford testified that she . . . did not hear what was said between the victim and Merriweather while they were fighting or talk to the victim regarding the fight. She also never called the police regarding the incident. Crawford acknowledged that the first time that she spoke with anyone regarding the fight was at the instant trial. Crawford could not recall the type of vehicle Merriweather entered after the fight, but she was able to remember that the vehicle was red.

During redirect examination, Crawford explained why she had not told anyone about the fight at the store between Merriweather and the victim. Crawford stated, "it didn't come to my mind, and I didn't think no more about it. . . . I thought he had probably . . . straightened it up." When she saw the police at the hospital the night her brother was shot, she did not think to tell them about the previous fight at the store at that time. She also stated that the police never questioned her about the shooting.

Vera Brooks, the victim's girlfriend, testified that the victim was at her apartment . . . during the late hours of May 14, 2005, and the early morning hours of May 15, 2005. While standing on the walkway area of the apartments, Merriweather, a person whom Brooks knew as "T-Mac," walked up to the victim with a baseball bat and asked the victim for seven dollars. Brooks intervened and told Merriweather, "I paid you that seven dollars," and Merriweather responded, "I didn't get it." Brooks then told the victim to go inside the apartment. Brooks stated that the victim went inside and locked the door. Approximately ten to fifteen minutes later, the victim stated that he was going back outside because he was not afraid. While the victim was standing outside, Brooks noticed "a little gray car" in the area which she had recognized as being associated with Merriweather. . . . Brooks then heard a voice stating, "now, what [are] you going to do[?]" The sound of a gunshot then followed. Brooks stated, that after the victim turned to enter the

apartment, Merriweather shot the victim a second time. The victim then collapsed in front of the apartment door. As Merriweather was walking away from the scene, Merriweather shot the victim a third time. Brooks stated that the only thing the victim said after he was shot was, "baby, it hurts." Brooks was only able to describe the gun used by Merriweather to shoot the victim as being silver and "kind of big." Later, Brooks gave a statement to the police and identified Merriweather in a photographic line-up as the person who shot the victim. Brooks also identified Merriweather as the perpetrator at trial.

Aaron Austin testified that he was inside Brooks' apartment at the time of the shooting. Austin stated that he heard three gunshots while he was lying in bed watching television. He then ran outside and found the victim lying on the ground stating, "He shot me. He shot me. He shot me." Prior to the shooting, Austin heard Merriweather and the victim arguing, but he did not know what the argument was about. He knew that Merriweather and the victim were the individuals who were arguing because he looked out the window and observed them. Austin also noticed that Merriweather had an object in his hand that resembled a bat. On cross-examination, Austin testified that he heard the gunshots within a couple of minutes of looking out the window and observing Merriweather and the victim arguing. On redirect examination, Austin stated that he did not know what the argument was about, but he did hear someone say the word "money."

Langdon Hubbert, a patrol officer with the Memphis Police Department, testified that . . . he . . . asked the victim if he knew who had shot him. The victim stated that "T-Mac" had shot him. . . . Brooks also informed Officer Hubbert that "T-Mac" was the person who shot the victim. Officer Hubbert stated that Brooks identified "T-Mac" as Taurus Merriweather.

Chastity Ragland, another patrol officer with the Memphis Police Department, testified that . . . Brooks told her that Merriweather was the person who shot her boyfriend. Officer Ragland knew Merriweather by the name of "T-Mac" from a prior encounter with him.

-3-

Lieutenant Mark Rewalt, formerly a sergeant with the homicide bureau of the Memphis Police Department, testified that Brooks was shown a photographic line-up to identify the shooter. He stated that Brooks immediately identified Merriweather as the person who shot her boyfriend. On cross-examination, Lieutenant Rewalt acknowledged that Brooks was the only person who positively identified Merriweather as the shooter.

. . .

Merriweather testified that he was not known as and had never been referred to as "T-Mac", but some people did refer to him as "Red" or "Slim." He stated that around eight or nine o'clock in the evening on Saturday, May 14, 2005, his father drove him to his cousin's house. . . . While at his cousin's house, he "popp[ed] a couple of pills, . . . smok[ed] some weed," "drank," and then "passed out" about fifteen or twenty minutes later. He stated, "The next thing I kn[e]w, I [woke] back up at home with my girlfriend," on Sunday morning around nine or ten o'clock. He learned of the victim's death from his girlfriend. Merriweather stated that he . . . knew Brooks, Austin, and the victim as "just neighbors downstairs." Merriweather stated that he did not borrow or loan any money to the victim. . . .

George Carr testified that he lived in the same apartment building as Brooks and was four apartment doors down from her unit. Carr stated that around dusk on May 14, 2005, he and his wife were sitting on their porch when they observed a man with a baseball bat "beating" on Brooks' door. Carr described the man as five feet six inches to five feet seven inches tall, weighing about 115 to 125 pounds. The man also had long dreadlocks and "real dark" skin, but Carr did not recall what the man was wearing. Carr stated that the man walked through an alley when no one answered the door. Carr then went inside his apartment to go to the bathroom. When he returned outside, Carr's wife informed him that the victim had been shot. From the time Carr saw the man with a bat knocking on Brooks' door until the time Carr went to the bathroom, about four to five minutes had passed. Another three to four minutes had passed

-4-

from the time he entered the bathroom until the time his wife informed him of the shooting. Carr stated that he was acquainted with Merriweather through Merriweather's mother and that Merriweather was not the person he saw knocking on Brooks' door with a baseball bat. . . .

On cross-examination, Carr testified that he saw a person whom he had never seen before running toward Simpson Street while he was returning to his porch. . . .

Teidre Sugars, Merriweather's sister, testified that she lived with Merriweather, Merriweather's girlfriend, and Merriweather's three children. She stated that Merriweather was lying on the couch when she arrived home around 11:09 p.m. or 11:19 p.m. Merriweather's girlfriend informed her that he was drunk and had been "throwing up." Sugars then went to her room. Around nine or ten o'clock the next morning, Sugars saw Merriweather on the couch where she saw him the night before.

Bill Pounders, employed with Shelby County Central Information Technology, testified that he maintains data for the jail management computer system. When an inmate is processed in the jail, information regarding alternative names or aliases are obtained from the inmate and entered on his or her "R & I number" that is specifically assigned to the inmate. Pounders stated that he researched the jail database for inmates with an alias by the name of "T-Mac" and retrieved six records with variations of the name "T-Mac." Merriweather's "R & I number" did not match any of the records that had the name "T-Mac" or a variation of the name as an alias.

Sergeant Mullins testified that while searching "Visions," the database system where offense reports are entered, he found Merriweather's name and address which included the alias "T-Mac." Sergeant Mullins acknowledged that he could not determine the date when the alias was entered into "Visions." He stated that Merriweather was not associated with the alias "T-Mac" in the jail management database system.

State v. Taurus Merriweather, No. W2008-00576-CCA-R3-CD, Shelby County, slip op. at 1-5 (Tenn. Crim. App. July 14, 2009), perm. app. denied (Tenn. Dec. 14, 2009).

At the post-conviction hearing, Glenda Adams, counsel at the Petitioner's first trial, testified that on January 27, 2007, she worked for the Shelby County Public Defender's Office and that she was assigned to the Petitioner's first degree murder case. She said that the State's primary witnesses were Vera Brooks and Aaron Austin, who identified the Petitioner as the person who shot the victim. She said the Petitioner, Ms. Brooks, and the victim argued over seven dollars. She said Ms. Brooks testified that the Petitioner possessed a silver and black bat during the argument, that she was not afraid, and that she and the victim went into their apartments.

Ms. Adams testified that the victim left the apartment to talk to someone outside and that Ms. Brooks followed to find out what they were discussing when she saw a gray car. She said Ms. Brooks went back into the apartment, looked out the window, and heard someone say, "What's up now?" She said Ms. Brooks was unable to testify about the length of time in which these events occurred. She recalled Ms. Brooks said that the events occurred quickly and that the shooter stood behind the air conditioner in the apartment window and only a few feet from the victim. She did not recall questioning Ms. Brooks about a man named Carl. She said Mr. Austin testified that he saw the argument between the Petitioner, Ms. Brooks, and the victim and that the Petitioner's bat was brown. She said that because the Petitioner denied being present for the argument and the shooting, she did not focus on the bat's color.

Ms. Adams testified that the Petitioner gave her the names of three potential alibi witnesses and that an investigator spoke to the Petitioner's father, his sister, and his girlfriend, Roxy Nichols. After the investigation was complete, "they" decided to call the Petitioner's father and Ms. Nichols as alibi witnesses. She said Ms. Nichols testified that she went to the store around 10:30 or 11:00 the night of the shooting and that the Petitioner was on the sofa asleep when she returned. She recalled Ms. Nichols stating that the Petitioner was drunk and had vomited on himself and that she helped him to the bathroom, gave him a bath, and put him into bed for the night. She said the jury was unable to reach a verdict during the Petitioner's first trial.

On cross-examination, Ms. Adams testified that the defense's theory of the case was that the Petitioner was not present for the shooting. She said that after the trial, she spoke to a juror who discredited the police officers's testimony. She said the other jurors wanted to convict the Petitioner of first degree murder. She did not participate in the second trial due to a scheduled surgery but worked with William Robilio, new trial counsel, until the second

trial. She gave Mr. Robilio her case file, including her trial notebook and transcript of the first trial, introduced him to the Petitioner, and discussed the strategy and proof presented at the first trial. She said Terrance Tatum, co-counsel, also worked with Mr. Robilio on the second trial.

Ms. Adams testified that she discussed Ms. Nichols's testifying with Mr. Robilio, who decided not to call her as a witness because of credibility issues. She said that at the first trial, Ms. Nichols had an outstanding arrest warrant related to an indecent exposure allegation. She said Ms. Nichols visited the Petitioner at the jail, exposed her vaginal area, and masturbated for the Petitioner's pleasure. She moved to exclude the information, but the trial court allowed the State to question Ms. Nichols about the incident because it showed her desire to please and help the Petitioner. She believed her testifying at the second trial was too risky. She said the Petitioner and Ms. Nichols lived together in the same area as Ms. Brooks and the victim at the time of the shooting.

Ms. Adams testified that at the first trial, the Petitioner's father did not recall the date of the shooting but recalled that the shooting must have occurred before 10:00 p.m. because he did not leave his home after 10:00. The Petitioner's father said that if he picked up the Petitioner and took him home, it was before 10:00 p.m. She agreed the Petitioner's father was not sure if he picked up the Petitioner on the night of the shooting. On redirect examination, Ms. Adams testified that during voir dire, the juror who refused to convict the Petitioner never stated that he distrusted police officers generally or that he would not participate in jury deliberations.

The Petitioner testified that Mr. Robilio and appellate counsel, Garland Erguden and Harry Sayle, did not provide effective assistance. He said Mr. Robilio was ineffective because he failed to impeach and cross-examine witnesses and failed to call alibi witnesses. He said Ms. Brooks and the victim were roommates, were friendly with him, and lived nearby. He said Ms. Brooks's testimony at the second trial differed from her prior testimony. He said Ms. Brooks testified at the first trial that the Petitioner walked up to the victim with a bat and asked about seven dollars in a non-threatening manner but that at the second trial, she said he held the bat like a weapon. He said that although Ms. Brooks did not mention the Petitioner's trying to open her apartment door at the first trial, she did at the second. He said Ms. Brooks testified at the first trial that after she and the victim left the apartment the second time, she heard, "What you going to do?," but that at the second trial, she testified that she heard, "Man, you going to shoot me over $7?" He said that at the second trial, Ms. Brooks testified for the first time about a man named Carl, who saw the shooting. He said Mr. Robilio did not investigate these discrepancies, use the transcript of the first trial to impeach Ms. Brooks, or request a continuance to investigate Carl.

The Petitioner testified that at the first trial, Ms. Brooks appeared confused when asked about the timing of the shooting and her location and distance from the shooter. He said Ms. Brooks stated that she walked to the breezeway to see the gray car and that when she returned, the shooting occurred. He said that at the second trial, Ms. Brooks placed herself near the air conditioner where the shooting occurred. He said Mr. Robilio did not question Ms. Brooks about the discrepancy. He said Mr. Austin testified at the first trial that he saw the Petitioner and the victim arguing when he looked through his opened front door and that the Petitioner had a wooden bat. He said Mr. Austin testified at the second trial that he looked out his window and that the bat was silver. He said Mr. Robilio did not question Mr. Austin about the discrepancies.

The Petitioner testified that he discussed his alibi witnesses with Mr. Robilio. He said that at the first trial, Ms. Nichols testified that the Petitioner attended a party the night of the shooting and that his father drove him home. He said Mr. Robilio told him that calling Ms. Nichols as a witness was not a good idea.

The Petitioner testified that Vivian Crawford was a witness at the second trial but not at the first. He recalled that Mr. Robilio objected to her testifying on the ground that the testimony was prejudicial but that the trial court overruled the objection. He said Ms. Crawford testified that she saw the Petitioner and her brother arguing one year earlier and that the Petitioner chased her brother with a stick. This issue was not raised in the appeal of his conviction. He wanted to add the issue to his appeal, but appellate counsel denied his request. He stated that Mr. Robilio did not object to his juvenile record being used to enhance his punishment and that Ms. Erguden failed to argue the issue on appeal.

On cross-examination, the Petitioner testified that Ms. Brooks's testimony about the timing of the shooting was different at the trials and that he was elsewhere at both times. He said, though, Ms. Brooks testified at both trials that the shooting occurred at 11:00 p.m. or 12:00 a.m. He stated that Ms. Brooks's testimony that she stood beside the air conditioner during the shooting placed her "in the line of fire" but that trial counsel did not question her about it. He said that he had known Ms. Brooks and Mr. Austin for about one year and that he saw them regularly in passing.

The Petitioner testified that he received a copy of the appellate brief, that he wanted to amend the brief, and that he wrote the Shelby County Court Clerk's Office requesting permission to supplement his brief, which was denied. He said he wanted to include issues regarding the use of his juvenile record at sentencing, Ms. Crawford's testimony, and ineffective assistance. He said he did not like the brief because it was vague.

The Petitioner testified that he recalled Mr. Robilio's questioning him, reviewing the discovery, and discussing the witnesses to prepare for the trial. He did not raise any complaints with Mr. Robilio. He said that Mr. Robilio visited him at least four times and that they discussed his case, the first trial, and the State's evidence. He said, though, that Mr. Robilio did not discuss the benefits and dangers of using certain witnesses. He agreed he was happy with Mr. Robilio's performance before the trial.

The Petitioner testified that at the time of the shooting, he had known Ms. Nichols for four years and that before the first trial, Ms. Adams and he decided to call Ms. Nichols as a witness. He said that at the second trial, Mr. Robilio decided not to call Ms. Nichols and called his sister instead. He agreed his sister testified that she saw him on the sofa in the early morning hours the night of the shooting and that Ms. Nichols told her that he had been home since 10:00 p.m. He agreed that Mr. Robilio found George Carr, who lived at the apartment complex and testified that he saw the shooting and that the Petitioner was not the shooter.

Roxie Nichols testified that at the first trial, she said that the Petitioner came home drunk around 10:00 the night of the shooting, that he was vomiting, that she cleaned him, and that he never left the house. She recalled Ms. Adams discussing the Petitioner's case with her before the first trial and said she was an alibi witness. She said that Mr. Robilio did not speak to her about the case, that she did not testify at the second trial, and that she was not involved with the investigation. She said the Petitioner talked to her about his wanting her to testify at the second trial. She said that she was charged with indecent exposure, that she was not convicted of the offense, and that Mr. Robilio did not discuss the charge with her.

On cross-examination, Ms. Nichols testified that at the first trial, she said the Petitioner came home drunk "on the night of the 14th going into the 15th." She agreed she was cross-examined about the indecent exposure charge at the trial but denied masturbating in front of the Petitioner and others. She agreed she and the Petitioner discussed that the indecent exposure allegation would be brought up at the second trial. She said the Petitioner did not ask her to call Mr. Robilio or tell her that he spoke to Mr. Robilio about her testifying. On redirect examination, Ms. Nichols testified that she assumed she would testify at the second trial.

William Robilio testified that he had been a criminal defense attorney since 1976 and that he had been at the Public Defender's Office for eight to nine years. He prepared for the trial by reviewing the transcript of the first trial, preparing a trial outline, reviewing the discovery package and witness statements, discussing the trial strategy with the Petitioner, and discussing the first trial with Ms. Adams and Mr. Tatum.

Mr. Robilio testified that during both trials, the defense focused on identity but that he decided not to use the Petitioner's father or Ms. Nichols as alibi witnesses at the second trial. He stated that the transcripts showed that the Petitioner's father could not "narrow down" the day of the shooting to be a good alibi witness and that Ms. Nichols had been arrested for indecent exposure. He said an officer testified at the first trial that he saw Ms. Nichols masturbating for the Petitioner. He said that had Ms. Nichols admitted her conduct at the first trial, he might have called her as a witness because he could have explained her conduct in a way for the jurors to conclude that she was not lying for the Petitioner. He said he decided to focus on building the Petitioner's credibility and impeaching Ms. Brooks's credibility. He stated that he discussed not calling Ms. Nichols as a witness with the Petitioner and that the Petitioner understood the strategy. He did not recall the Petitioner's expressing an opinion on the decision. He also said Ms. Nichols's demeanor at the post-conviction hearing reinforced his decision not to call her as a witness at the trial.

Mr. Robilio testified that he called the Petitioner's sister as the alibi witness, who stated that she went into the Petitioner's apartment to find Ms. Nichols, who told her that the Petitioner had not been home long, had been to a party, had been vomiting, and was "passed out" on the sofa. He said the Petitioner's sister testified that the Petitioner was still asleep when she left for work the next morning and that she would have known if he had left the house that night. Mr. Robilio agreed the jury heard Ms. Nichols's testimony from the first trial through the Petitioner's sister at the second. He said that he found Mr. Carr, the victim's neighbor, who testified that he heard an argument outside at the time of the shooting but that the Petitioner was not involved. He discussed the alibi witnesses with Ms. Adams.

Mr. Robilio testified that he thought he impeached Ms. Brooks and Mr. Austin effectively. With regard to Ms. Brooks's testimony, he agreed that at the second trial, she said she was in a narrow hallway rather than an open breezeway. He said he and the Petitioner discussed the discrepancy and liked her testimony because she placed herself in the line of fire. He did not think Ms. Brooks was credible. He and the Petitioner discussed highlighting her inconsistencies, but he did not want to give Ms. Brooks the opportunity to create a more credible story. With regard to Ms. Brooks's inconsistent statement on her location at the shooting, he said her placing herself in the line of fire lowered her credibility.

Mr. Robilio testified that he did not impeach Mr. Austin on his inconsistent testimony about the bat color because the issue was the killer's identity, not whether there was an argument with someone who had a bat and later killed the victim. He said he discussed this with the Petitioner. He said that he objected to Ms. Crawford's testimony about the Petitioner's chasing her brother with a stick and that he used his surprise to impeach her. He said he established Ms. Crawford never told the police about the incident.

Mr. Robilio testified that it was common and permissible to use juvenile records at sentencing. He said that during the Petitioner's voir dire, the Petitioner said he did not have any complaints or additional investigation requests. A transcript of the voir dire was received as an exhibit. Mr. Robilio was not involved in the appellate process.

On cross-examination, Mr. Robilio testified that it took several months to prepare for the second trial. He said that although he never discussed the indecent exposure charge with Ms. Nichols, she was not convicted of it. He told the Petitioner that his sister was a better alibi witness and that he was going to use her at the trial. Although he did not recall stating that he was not going to use Ms. Nichols, he discussed with the Petitioner the trial strategy and who would be used for a particular purpose.

Mr. Robilio testified that after reading the transcript of the first trial, he did not think Ms. Brooks was a very strong witness for the State. He recalled that he questioned Ms. Brooks about her statement to the police that the victim, her boyfriend, was an alcoholic. He said she denied telling the police the victim was an alcoholic and denied signing the statement. He agreed it showed she was mistaken or untruthful. He did not recall the reason he did not notice Ms. Brooks's inconsistent statement about whether the Petitioner held the bat in a threatening manner. He did not recall the reason he did not impeach Ms. Brooks about her testimony at the second trial that the Petitioner threatened her with the bat and tried to get into her apartment. He said that if the inconsistent statements had struck him as important, he would have questioned her about it. He did not recall Ms. Brooks's stating at the first trial that the victim said, "What you going to do?" and stating at the second trial, "You're going to shoot me over $7?" He said, though, that the Petitioner denied lending the victim any money.

Mr. Robilio testified that he did not question Mr. Austin about his inconsistent statement about the color of the bat and whether it was wooden or metal. He said he established at the trial that Ms. Brooks and Mr. Austin were friends and roommates for many years. He agreed Ms. Crawford's testimony that the Petitioner's chasing her brother with a stick-like, blunt object affected the trial.

Garland Erguden testified that she worked in the Public Defender's Office for twelve or thirteen years and that the last nine years she worked solely on appeals. She said that she reviewed the Petitioner's file, read the motion for new trial and the trial and sentencing transcripts, and prepared the brief. She said her office sent the Petitioner a generic letter in May 2008, which explained the appellate process and told him that it would take time to compile the record. She said that on August 15, 2008, she sent the Petitioner a letter, which explained that she was his appointed appellate counsel, that he would receive a copy of the brief once it was completed, and that it took about six to twelve months to receive an opinion.

-11-

The letter told the Petitioner to write if he had any questions. She did not hear from the Petitioner and said she mailed a copy of the brief to him on September 19, 2008. She did not receive any communication from the Petitioner. In January 2009, she accepted a position in the District Attorneys Office and wrote the Petitioner a letter stating her reason for leaving, her withdrawal as counsel of record, and that a new attorney would handle his appeal. She gave the Petitioner her supervisor's address for any questions.

Ms. Erguden testified that some of the issues raised in the motion for new trial were not raised on appeal because trial counsel were told to raise everything in the motion for a new trial to preserve it for appeal. She said three of the seven issues in the motion were variations of insufficient evidence. She said the prior bad act raised by Ms. Crawford's testimony was not raised on appeal because case law showed there was not a 404(b) issue and the trial judge made a "legally correct" ruling. With regard to Mr. Robilio's impeachment of Mr. Austin, she said the trial court did not allow Mr. Robilio to impeach him with "stale" felonies or a recent misdemeanor drug offense because it had nothing to do with honesty. She agreed with the court's ruling. Mr. Robilio was also not permitted to impeach Ms. Brooks with her driving under the influence and drug convictions on the same ground. Mr. Robilio was permitted to impeach Ms. Brooks with her theft of property conviction. She said that an issue was raised in the motion for a new trial related to whether Ms. Brooks's statement identifying the Petitioner after the shooting was an exited utterance. She disagreed with the court's ruling and raised sufficiency of the evidence on appeal. She chose not to raise frivolous issues and to raise the strongest issue, identification.

Ms. Erguden testified that admitting a defendant's juvenile record during sentencing was standard procedure and was used to consider a defendant's prior criminal activity. She said the trial court properly considered the Petitioner's juvenile record. She said her office never raised ineffective assistance on direct appeal because it limited the evidence to the trial record and stripped a defendant of post-conviction rights.

Ms. Erguden testified that the public defender's file did not contain letters addressed to her from the Petitioner, although the file contained numerous letters to her supervisor and Mr. Sayle. She said the letters attached to the Petitioner's request to supplement the appellate brief were not in the file. She noted that the first letter attached to the Petitioner's request to supplement the brief and addressed to her was dated March 13, 2008. She said that no attorney was assigned to the Petitioner's appeal at that time and that she did not know how the Petitioner got her name because she was not appointed until August. The Petitioner attached four additional letters dated April 22, May 15, July 29, and August 1, which requested the status of his appeal and criticized counsel. She said it was her practice to respond to all letters within twenty-four hours of receipt. On cross-examination, Ms. Erguden testified that trial courts did not always make the correct ruling but that she read the

case law, including the cases on which the court relied, and reached her own conclusion. She concluded the court's rulings were not suitable for appeal.

Harry Sayle testified that he had worked for the Public Defender's Office for ten years and that when he took over the Petitioner's case, the office was awaiting this court's opinion. He received several telephone calls from the Petitioner, and his supervisor received a letter stating that the Petitioner was told to contact her with any questions and his desire to raise additional issues in the appeal. He said he wrote the Petitioner a letter on January 30, 2009, telling him that he reviewed the Petitioner's request and decided to wait for this court's opinion. He told the Petitioner any additional issues were appropriate for post-conviction relief. On cross-examination, Mr. Sayle testified that he considered the client's wishes about which issues to raise on appeal but that he did not give the client complete control. He said that if an issue was credible and arguable, he raised it. He never met with the Petitioner.

In denying the petition for post-conviction relief, the trial court stated that the Petitioner received a fair trial and a sufficient appeal by "excellent, prepared attorneys." With regard to Ms. Nichols, the court found that she was not an effective alibi witness and that her sexual conduct at the jail showed "she was . . . willing to commit perjury" for the Petitioner. The court stated that it agreed with Mr. Robilio's opinion that Ms. Nichols "lost control" and had an attitude during cross-examination at the post-conviction hearing. The court found that Mr. Robilio did not call Ms. Nichols as a witness because of her credibility issues, that the Petitioner's sister was a much more favorable alibi witness, and that his sister testified about when the Petitioner arrived home. The court found that Mr. Robilio presented an additional witness, Mr. Carr, who said the Petitioner was not the shooter, and that Mr. Robilio presented a witness who worked at the jail, who said T-Mack was not the Petitioner's alias. The court found that there were "very valid reasons" for not calling Ms. Nichols as a witness at the second trial and concluded that counsel was not deficient by failing to do so.

With regard to Mr. Austin's inconsistent testimony about the description of the baseball bat, the court concluded that Mr. Robilio was not deficient in failing to cross-examine on this point. The court found that the operative fact was that the bat existed, which the Petitioner did not dispute, and that the color discrepancy was insignificant. The court found that cross-examination about the bat's color seen by witnesses at night would not have affected the jury's verdict.

With regard to Ms. Brooks's inconsistent statements about where she was standing at the time of the shooting, the trial court concluded that Mr. Robilio was not deficient by failing to cross-examine on this point. The court accredited Mr. Robilio's testimony that he and the Petitioner discussed whether he failed to question Ms. Brooks about any particular subject and that he and the Petitioner both liked that her testimony placed her in the line of

fire. The court found that Mr. Robilio reasonably concluded that Ms. Brooks was not credible and that he did not want to give her an opportunity to create a more credible story. The court found that Mr. Robilio's explanation was uncontroverted and that it was a reasonable trial strategy to conclude Ms. Brooks's testimony created more doubt in the second trial.

As for Mr. Robilio's failure to meet with the Petitioner to present a viable defense, the trial court found Mr. Robilio was prepared for the second trial and focused on the shooter's identity, which was the "only defense possible given the Petitioner's testimony." The court noted that the Petitioner had no complaints during voir dire. The court accredited Mr. Robilio's testimony about his preparation for the trial, including his consultation with Ms. Adams and Mr. Tatum. The court found that the Petitioner's trial attorneys were credible and that their testimony was uncontradicted.

With regard to Ms. Erguden's failure to raise additional issues requested by the Petitioner on appeal, the trial court accredited Ms. Erguden's testimony and concluded that each issue had no merit on appeal. The court concluded that Ms. Crawford's testimony about the Petitioner's prior bad act was admitted properly under State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993). The court concluded that the trial court properly considered the Petitioner's juvenile record during sentencing and properly excluded Mr. Austin and Ms. Brooks's prior convictions.

On appeal, the Petitioner contends that the trial court erred by denying his petition for post-conviction relief. He argues that Mr. Robilio provided the ineffective assistance of counsel by failing to (1) call the Petitioner's primary alibi witness, Ms. Nichols, at the second trial; (2) impeach Ms. Brooks and Mr. Austin with their inconsistent statements; and (3) consult with him without delay and about the unavailability of potential defenses.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2010). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2010).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient

and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

With regard to Mr. Robilio's failure to call Ms. Nichols as an alibi witness at the second trial, counsel made a strategic decision to call the Petitioner's sister instead. The evidence does not preponderate against the trial court's factual findings. We conclude that counsel was not deficient.

With regard to Mr. Robilio's failure to impeach Ms. Brooks and Mr. Austin with their inconsistent statements, counsel made a tactical decision not to cross-examine Ms. Brooks. With regard to Mr. Austin, the shooter's identity was the issue, not whether someone with a bat killed the victim. The evidence does not preponderate against the trial court's factual findings. We conclude that counsel was not deficient.

With regard to Mr. Robilio's failure to consult with the Petitioner without delay and about the unavailability of potential defenses, the Petitioner only discusses in his brief defense counsel's general obligations to investigate a client's case and to confer with a client without delay and often enough to determine if potential defenses are unavailable. The Petitioner does not specify how Mr. Robilio was ineffective at the trial or make appropriate

references to the record or any legal authority. <u>See</u> Tenn Ct. Crim. App. R. 10(b) (stating that "issues which are not supported by argument, citation to authorities, or appropriate references to the record" are waived). In any event, the record shows that Mr. Robilio consulted with the Petitioner and conducted the appropriate pretrial investigation. We conclude that counsel was not deficient.

The Petitioner also argues that Ms. Erguden provided him with ineffective assistance because she did not "explore all avenues available" to him. The Petitioner only states that "once an attorney has time to review the record, without the immediate pressures of trial, this error should be obvious." He also states that counsel's "lack of request for the circumstantial evidence jury instruction amounts to ineffective assistance. . . ." We note that this claim was not raised in the petition for relief and that no relevant evidence was presented at the post-conviction hearing. The Petitioner fails to make appropriate citations to the record and to legal authority. See Tenn Ct. Crim. App. R. 10(b). In any event, the trial court accredited Ms. Erguden's testimony and concluded that the trial court made proper rulings regarding Ms. Crawford's testimony, Ms. Brooks's and Mr. Austin's convictions, and the use of the Petitioner's juvenile record during sentencing.

We conclude that the record does not preponderate against the trial court's findings and that the Petitioner is not entitled to relief. In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-16-